# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 15, 2012 Session

## STATE OF TENNESSEE v. ANDREW CROSS

### Appeal from the Criminal Court for Polk County
### No. 10132    Amy A. Reedy, Judge

### No. E2011-02106-CCA-R3-CD December 28, 2012

Defendant, Andrew Cross, pled guilty in the Polk County Criminal Court, to one count of aggravated burglary, a Class C felony, and one count of Class E felony theft. At the sentencing hearing, the trial court imposed the minimum allowable sentences of three years for aggravated burglary and one year for theft, and ordered the sentences to be served concurrently. The trial court also ordered the effective sentence of three years suspended, to be served on probation, but the trial court denied Defendant's request to be granted judicial diversion. In this appeal, Defendant argues that he should have been granted judicial diversion. We disagree, and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JOSEPH M. TIPTON, P.J., filed a dissenting opinion.

John P. Fortuno, Cleveland, Tennessee, for the appellant Andrew Cross.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Robert Steven Bebb, District Attorney General, and Drew Robinson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Facts*

At the guilty plea hearing, the Assistant District Attorney General announced the facts upon which the convictions were based:

THE COURT:          General, what are the facts that we have here?

[PROSECUTOR]:    Yes, your Honor.  On April 5th, 2010, the victim, [  ], returned home to his summer home on Welcome Valley Road, [ ] in Benton.  He found that someone had entered his summer home, Big Frog Rafting, without his permission and taken a Vizio TV and some loose [change].  Value, total value was about $550.00.  On July the 16th of that same year Officer Hicks discovered the Vizio TV at the home of the defendant Andrew Cross located just down the street from the victim at [ ] Welcome Valley Road.  He's pleading guilty to the burglary and theft.  They recovered the TV, your Honor, and other property that they had.  I think the $50.00 restitution which constitutes the loose change that the victim said he had in a bottle that was taken.

The pre-sentence report was made an exhibit at the sentencing hearing.  That document reveals that Defendant was 23 years old at the time of the offenses.  Defendant's only prior involvement with the criminal justice system was a dismissed charge of vandalism in 2007.  He graduated from high school in 2004 and was attending Cleveland State Community College full time with an aspiration to become a physical therapist.  Documentation from the school showed that Defendant had a cumulative 3.24 GPA through the spring 2011 semester.  Defendant reported that he had never used any illegal substance, that he had not drunk alcohol in a while, and when he did drink, it was only "3 to 4 beers rarely."  Defendant's family members consisted of his father and step-mother, two sisters (Amanda and Jessica), one step-sister, one step-brother, and his mother and step-father.  Defendant wrote the following on the presentence questionnaire regarding his relationship with his family members: "My dad, step-mom, and Jessica [one of his sisters] are the best.  I play XBOX Live with Tony.  I don't like the rest and don't talk to them."

Defendant started employment at a Target store approximately four months prior to the sentencing hearing held in September 2011.  Prior to that, Defendant worked for about five months in 2007-08 at a business called "For Your Entertainment."  He had done odd jobs between that job and the Target store and had worked for approximately six months in 2007.  Defendant reported that he was in the Air Force from August 2004 (the year he graduated from high school) to September 2006.  Also made an exhibit at the sentencing hearing was a detailed performance review by his employer, Target Stores, showing that in almost all categories reviewed, Defendant received a rating of "Fully meets and sometimes exceeds

position requirements. Demonstrates full understanding of all required functions." In three other categories, Defendant received a ranking that was one step higher than the ranking quoted above.

Defendant testified at the sentencing hearing. He reiterated the basic facts summarized above from the presentence report and added the following information. At the time of sentencing, Defendant was finishing up his second year at Cleveland State Community College. He attended classes five days per week and also worked at the Target Store on Mondays, Wednesdays, Fridays, Saturdays, and Sundays. Defendant planned to attend the University of Tennessee at Chattanooga to obtain his Bachelor's Degree upon his graduation from Cleveland State Community College.

Defendant testified that he was approached by a supervisor in the Assets Protection and Security Division of the Target store to see if he was interested in applying to be promoted to work in that division, "because I have a military background." Defendant applied for that position.

Defendant formerly worked at Cleveland State in the Fitness Center pursuant to a work study grant. The grant ended, but he continued to do work voluntarily there three days per week. Defendant had accrued $12,000.00 to $13,000.00 in student loans. Defendant resided at an apartment in Cleveland with "my girlfriend and my cousin and her baby." He testified that he received "a general discharge under honorable conditions" after a little over two years in the Air Force.

Defendant testified that he went to the house where he committed the offenses because he "knew nobody was going to be there." He testified that at the time, he was "low on money and everything." Defendant further testified on direct examination that he was "close" with his family, specifically mentioning his father, step-mother, step-brother, and his mother and step-father.

On cross-examination by the prosecutor, Defendant said he had never contacted the victim to apologize for the crimes because he did not "know any way to get in contact with" the victim. Defendant acknowledged that in the vandalism charge against him, which was dismissed, one of his sisters was the victim and the property involved was the hubcaps on her vehicle. In his final question to Defendant, the prosecutor asked Defendant why the trial court should grant Defendant judicial diversion. Defendant's entire response was,

> Well, I think I'm doing well in life. I mean I'm in school, I'm after [sic] a really good career. I'm working, I have a good life and I have a good relationship with my family and everything.

The trial court asked Defendant several questions after defense counsel and the prosecutor were finished examining Defendant. As pertinent to this appeal, the following exchanges between the trial court and Defendant are relevant.

THE COURT: Well, I'm looking here at this investigative report and when it talks about your family there's a comment in here from you, "I don't like the rest and don't talk to them," in relation to your mother and your sister and your step-father and step-brother and step-sister.

[DEFENDANT]: Well, I do talk to my step-brother and my step-sister. I mean we've talked. I mean after the statement and everything, and everything is fine. I talked to my step-mom, my mother and step-father some but it's not a lot. I mean they live here in Benton and I live in Cleveland and I'm busy with school and everything.

THE COURT: So what does the statement mean, "I don't like the rest and don't talk to them." He asked you about that vandalism. It was directed at your sister. What's the deal, what's your issue?

[DEFENDANT]: Me and my sister didn't get along at the time, and after that happened, I mean we got a lot closer and then I moved out and I moved in with my ex-girlfriend, and she just, I had a car there and I wouldn't come move it and I guess, I mean I don't know what she was–it wasn't so much my sister as her fiancé as far as I know. I mean that's what everybody has told me. I haven't talked to my sister about it [too] much. I don't want to, you know, start problems or anything.

THE COURT: He asked you why you did this, and you really didn't explain that. I really don't know why you did it, where you went, why you went there, I really don't know why you did it. You have not explained that to me at all.

[DEFENDANT]: When I said I knew there wouldn't be anybody there and I just –

THE COURT: How did you know that?

[DEFENDANT]: It was April and in April they don't have like anybody at the rafting company, like in April it's [too] cold for rafting.

THE COURT: How did you know that?

[DEFENDANT]: I've lived here, I lived in Benton for a couple of years after I got out of the military and I just, I mean I could look down the road and see I mean nobody there.

THE COURT: So was it near where you lived?

[DEFENDANT]: Yes, ma'am.

THE COURT: It was near where you lived?

[DEFENDANT]: Yes, ma'am.

THE COURT: And so were you down there on a regular basis?

[DEFENDANT]: At the rafting company?

THE COURT: Yes.

[DEFENDANT]: No, ma'am.

THE COURT: What caused you to be down there on this date?

[DEFENDANT]: It was, really I don't have much of an explanation. I just went down there because I knew nobody would be there and just to see what was there pretty much.

THE COURT: Did you go there to break in?

[DEFENDANT]: No, ma'am.

THE COURT:       Were you working at the time?

[DEFENDANT]:     No, ma'am. Well, yes, ma'am, I was working in the Fitness Center. The hours there, I think I got like 10 hours a week. It wasn't much.

THE COURT:       How did you get in this building?

[DEFENDANT]:     I walked in –

THE COURT:       Or home?

[DEFENDANT]:     I guess it's the front door. It was unlocked, it was just there. It was not locked and I just opened the door and went in.

THE COURT:       Do you know [the victim]?

[DEFENDANT]:     No, ma'am.

THE COURT:       Have you tried to contact him?

[DEFENDANT]:     No, ma'am. Like I said I don't know how to get in contact with him. I don't know if he's still at the rafting company or anything.

THE COURT:       Have you been back there?

[DEFENDANT]:     No, ma'am.

THE COURT:       Does Target know that you have [pled] guilty to aggravated burglary?

[DEFENDANT]:     No, ma'am.

THE COURT:       Why don't they know that?

[DEFENDANT]:     They've done a background check and they've never asked about it or anything and so I haven't told them.

THE COURT:        Don't you think it would be important to them to know that if you are going to be security agent for them that you are convicted of aggravated burglary?

[DEFENDANT]:      Yes, ma'am.  I've thought that over recently when they asked me if I wanted to be in the security program.

At the request of the trial court judge, who wanted to hear law enforcement's position on sentencing, the State called Detective Joe Price to testify.  When asked about his opinion of Defendant receiving judicial diversion, Detective Price testified, "[m]y personal opinion is no, but that's, I've been in law enforcement for 20 years and this is the way I feel as far as any kind of burglary."  Detective Price further testified that it was not uncommon for the rafting companies in the area, such as the residential premises of the victim in this case, to be victims of burglaries.  Upon cross-examination Detective Price admitted he would never "stand in the way" of someone such as Defendant "bettering" himself through judicial diversion, but it was "just" his opinion that diversion should not be granted in burglary cases.

In its ruling at the sentencing hearing, the trial court found that no statutory enhancement factors and no mitigating factors were applicable.  The trial court determined that there was no proof in the record as described in Tennessee Code Annotated section 40-35-103(1) "to say that alternative sentencing should not be applied" to Defendant.  As to whether Defendant should receive judicial diversion, the trial court came to the following conclusions regarding the manner of service of the effective sentence of three years.  The lack of any criminal convictions, the particular circumstances of the offense, and Defendant's physical and mental health weighed in Defendant's favor.  Furthermore, Defendant's social history and the deterrence factor to Defendant and others were neither in Defendant's favor nor weighed against him.  However, even though the trial court granted full probation, it denied judicial diversion because of a lack of candor and honesty by Defendant, and because of the "attitude of law enforcement."

The trial court specifically ruled as follows.

. . .maybe [Defendant] is just very guarded, maybe and he just holds things back, but the Court finds that that is his [amenability] to correction, that is one of the factors that the Court is to consider, along with attitude of law enforcement, which weighs against him.  And that [amenability] to correction, it bothers the Court because I don't feel like you have gone out there and been honest about what - - you are convicted of aggravated burglary and theft.  I don't know if you even understand that, but you are

-7-

working somewhere and you have [pled] guilty to aggravated burglary and theft and I do not find you to be credible here today. And even though that shows me a lack of rehabilitation potential on your behalf I am going to grant probation, but I'm not going to grant Judicial Diversion because I do not feel like he's honest with the Court here today and I believe that's the [amenability] to correction and I think it weighs extremely heavy against him here today because of some of his testimony, some of the things that he has withheld from the Court and his employer and the offense itself, which is an offense of dishonesty, and when these kind of hearings happen those of us in the criminal justice system say to ourselves "I get why this is an offense of dishonesty." You are showing me why it is because you are continuing to do things that are dishonest by not being open and forthright. I'm not going to sentence to any time in custody, and I am going to sentence him to the minimum amount that I can, which is three years on the aggravated burglary and one year on the theft, suspended immediately. No incarceration on either one of those, but I am not going to grant Judicial Diversion in this case because I do find again that the [amenability] to correction weighs very heavy against him and I think that his lack of credibility shows a lack of rehabilitation potential even though I'm willing to grant probation and straight supervised probation.

*Analysis*

Following a determination of guilt by plea or by trial, the trial court, in its discretion, may defer further proceedings and place a qualified defendant on probation without entering a judgment of conviction. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who is found guilty of a misdemeanor or a Class C, D, or E felony who has not previously been convicted of any felony or of a Class A misdemeanor, and is not seeking deferral for a sexual offense. Tenn. Code Ann. § 40-35-313(a)(1)(B). Also, a qualified defendant can be granted judicial diversion only once. Tenn. Code Ann. § 40-35-313 (a)(2); *State v. Schindler*, 986 S.W.2d 209, 210 (Tenn. 1999).

On appeal, the trial court's decision to deny judicial diversion will not be disturbed absent an abuse of discretion. This Court will give the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting *State v. Hammersley*, 650 S.W.2d 352, 356 (Tenn. 1983). The same factors used to grant pre-trial diversion are used in determining whether judicial diversion should be granted. *State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. 1997).

In determining whether to grant judicial diversion, the trial court is to consider:

(a)     the accused's amenability to correction;

(b)     the circumstances of the offense;

(c)     the accused's criminal record;

(d)     the accused's social history;

(e)     the accused's physical and mental health;

(f)     the deterrence value to the accused as well as others; and

(g)     whether judicial diversion will serve the interest of the public as well as the accused.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)(citations omitted).

Although factor (g) was not specifically articulated in those words by the trial court, we deem the trial court's reliance upon "law enforcement's attitude" in light of Detective Price's testimony to pertain to factor (g). With absolutely no disrespect to Detective Price, because he answered the questions presented to him with credibility as implicitly found by the trial court, we must disregard his testimony. It is clear that his testimony was that in his opinion, judicial diversion should *never* be granted in a burglary case, even though he admitted he would never get "in the way of anybody trying to better" himself. Our General Assembly has, for a long time, declared its clear intent that some offenders who commit some burglaries are eligible for judicial diversion. To rely upon a law enforcement officer's personal opinion that no defendant guilty of any burglary could ever be granted judicial diversion would be a usurpation of one co-equal branch of government (the Legislative branch) by another co-equal branch of government (the Judicial branch). Accordingly, we are unable to use the "attitude of law enforcement" to affirm the trial court's decision.

However, from the record, it is obvious that the trial court heavily relied upon Defendant's lack of candor as an indication of a strong lack of amenability to correction as a basis to deny the extraordinary relief of judicial diversion. If successfully completed, judicial diversion results in no conviction and an expungement of all public records relating to the charges and the finding of guilt, whether by plea or by trial. Tenn. Code Ann. § 40-35-313(b); *Schindler*, 986 S.W.2d at 211. The trial court found that the facts of the case justified full probation with its resultant criminal record of two felonies. *However*, it also concluded that Defendant's lack of amenability to correction based upon not being credible in his testimony and a lack of honesty with his employer justified the denial of judicial diversion. Even if nondisclosure to the employer does not reflect dishonesty, lack of credibility in his testimony is sufficient to justify the trial court's conclusion. At a sentencing hearing, the trial court, as the trier of fact, listens to the testimony and observes the demeanor of the witnesses.

The appellate court gives great weight to the determinations made by the trial court concerning the credibility of witnesses. This Court will not interfere with the trial court's findings unless the record preponderates against them. *State v. Melvin*, 913 S.W.2d 195, 202 (Tenn. Crim. App. 1995).

Based upon our review of the record we are unable to conclude that the trial court abused its discretion by denying Defendant judicial diversion.

## CONCLUSION

For the reasons stated herein the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE